WILLIAM NAUGHTON

*v.*

GEORGE W. ELLIOTT.

[Filed January 30th, 1905.]

1. Parol evidence which tends to vary the description of a lot in a lease is inadmissible in locating the boundaries.

2. Where a contract uncertain in its terms has been acted on and partly performed, the court, in order to relieve the objection of uncertainty, will, for the construction of the instrument, have regard in some cases to the use and course of dealing of the parties, to the surrounding circumstances, and to their conduct between the making of the agreement and the commencement of the suit.

3. The lease of a lot contained an option to complainant to purchase. The boundary line on one side of the lot was irregular, and from the description in the instrument it was uncertain how much of the lot was included in the option. Complainant exercised the option and claimed the entire lot and sought specific performance. The evidence showed that if there was any mistake in the description it was made by the defendant, and that the complainant understood the entire lot was included, and, with such understanding, arranged the buildings on the lot.—*Held,* that the conveyance of the entire lot should be decreed.

Heard on bill, answer, replication and proofs.

*Mr. Frederick W. Hope* and *Mr. James E. Degnan,* for the complainant.

*Mr. William J. Leonard* and *Mr. Richard V. Lindabury,* for the defendant.

EMERY, V. C.

This is a suit for the specific performance of an agreement or agreements to convey lands and is brought by the purchaser against the vendor. The first question which arises under the pleadings and proofs relates to the boundaries of the lot to be conveyed. The defendant owns a lot on the corner of Ocean avenue and New street, in the borough of Seabright, and executed two papers to the complainant, both drawn by himself, relating to the lease and sale of the lot. The first was an agreement, dated February 11th, 1899, for the sale to defendant of the buildings then standing on the lot in connection with a lease of the premises and an option to purchase; and the second was the lease subsequently executed on May 15th, 1899, which contained an option to purchase. In the first agreement the buildings are described as standing "on my lot on corner of Ocean avenue and New street," and the "said lot" is to be leased and sold. In the lease itself the lot is described as being on the "northwest corner of Ocean avenue and New street, said lot having a frontage of thirty-one and a half feet on Ocean avenue and at least one hundred and four feet on New street," and the option given in the lease is to purchase "the lot or premises hereby leased." While the lease gives two lines only, the whole lot owned by defendant is an L-shaped lot, the rear of the lot, on New street, being for about thirty-seven and one-half feet wider by twenty-five feet than the front portion of the lot. Complainant claims that the entire lot was leased and agreed to be sold, while defendant claims that the portion of the lot intended to be leased or sold was a rectangular lot, thirty-one and one-half feet on Ocean avenue and one hundred and four feet on New street, and further that the one hundred and four feet on New street is to be measured from a corner of the lot designated in

the deed conveying the premises to him, and that, as so located, there was reserved from his entire lot on the corner, and from the operation of the lease and agreement to sell, a strip on the rear of the lot about eight feet in width, together with the rear of the "L," about twenty-five by thirty-eight feet. At the time of the first agreement (February 11th, 1899) the buildings on the premises were a building, used as a hotel or saloon, about twenty-five feet square, located on the corner, and a barn on the rear of the lot. This barn fronted on New street and was about thirty feet in width on New street and was located within a few inches of the rear line of the lot; its depth, taking in an addition or lean-to at the rear, was about fifty-four feet, and, with the lean-to, the barn covered practically the entire rear of the lot. The barn was moved to this location by one of the defendant's former tenants, named Reese, and originally had been a building about two stories or one and a half stories high and about thirty feet square. The addition or lean-to to the barn on its north side was built by one Zigler (or Sigler) the tenant, whose administrator sold the house and barn to the defendant. This addition was a one-story structure, connected with the barn by opening or sliding doors, and was used for stalls for horses. In the bill of sale, by which defendant purchased the buildings for $425 from the administrator, they were described as "all that certain house and barn erected and being on leased ground on west side of Ocean avenue, at Seabright, Monmouth county, known and called 'Reese's Saloon.'" About the time of his purchase of the lease and buildings the defendant made the agreement with the complainant, dated February 11th, 1899, in his own handwriting, by which, in consideration of $775 received from complainant, he agreed

"to give to the said Naughton a bill of sale of the buildings now standing on my lot on corner of Ocean avenue and New street, Seabright, N. J., formerly owned and occupied by Arthur M. Sigler and wife; also a lease on same lot expiring on the eleventh day of November, 1899. I also agree to renew the lease for the said lot, at a rate of $650 per year, for three years, ending November 11th, 1902; also, will give said William Naughton privilege of purchasing said lot at $4,000 at the expiration of the lease as above."

Upon the execution of this agreement, and before the execution of any other paper, the complainant (Naughton) entered into possession of the premises, including the whole lot and all of the buildings thereon. On May 15th, 1899, the defendant delivered to complainant two other documents, also written by himself. One was a bill of sale for $425 for

"all that certain house and barn, erected and being on leased ground on the northwest corner of Ocean avenue and New street, borough of Seabright, N. J., known and called 'Reese's Saloon,' the same being property conveyed to Elliott by Hirschfield, admr. of Sigler, on February 17th, 1899."

The other document was a lease to November 11th, 1902, in which the premises leased were described as being

"all that certain lot, tract or parcel of land, premises, situate in the borough of Seabright, * * * on the northwest corner of Ocean avenue and New street, said lot having a frontage of thirty-one and a half feet on Ocean avenue, and at least one hundred and four feet on New street."

In the lease it was further agreed that Naughton "shall have the privilege of purchasing at the expiration of the lease the lot or premises herein leased and described for the sum of $4,000," and Elliott agreed "that at the expiration of the entire term, upon the said William Naughton paying to him the sum of $4,000, he would give a warranty deed, giving title to said lot," and the lease was not negotiable or transferable. The defendant now claims that the lot leased and intended to be sold, as described in this lease of May 10th, 1899, was not the entire lot then occupied by the buildings, nor his entire lot on the corner, but was only a rectangular lot, fronting thirty-one feet six inches on Ocean avenue and one hundred and four feet on New street. He further claims that, for the purpose of locating the line of the leased lot on New street, the corner or beginning point is not the line of the hotel building, as it then stood on the building line of Ocean avenue, but is the corner of Ocean avenue, as it existed when defendant himself purchased the property, in June, 1886, and before the avenue was widened, in 1887. If the line of the leased lot of one hundred and four feet on New street begins at this former line of Ocean avenue, and the lot leased is only a rect-

angular lot, then there will be reserved to the defendant from the
entire lot a strip of about eight feet in width at the rear of the
lot, together with a lot twenty-five by thirty-eight feet in the
"L" extension. Defendant says that this rectangular lot, reach-
ing only to within eight feet of the rear of his lot, is the lot which
he leased, and which he intended to lease and to sell, and he now
offers to execute a deed for this rectangular, so described, lot.
Complainant claims that he is entitled to a deed for the entire
lot and refuses to accept the deed tendered by defendant. The
question of boundaries depends, in the first instance, on the
proper location of the corner or beginning point for the line of
one hundred and four feet along New street, as described in the
lease. It appears that in the deed conveying the lot to the de-
fendant it was described as a lot

"beginning at the northwest corner of Long Branch and Seabright turn-
pike [now Ocean avenue], as it was laid out and existed on the 25th day
of December, 1881, and a new street running westerly along the north
side of said street 112 feet 6 inches," &c.

After the date of this deed, and in 1887, Ocean avenue was
widened about seven feet at this point. In June, 1891, a fire
destroyed all the buildings in this vicinity, and on November
11th, 1891, the lot being unimproved, defendant leased to one
George A. Reese, for five years, at a rental of $250 per year, a
tract of land on the corner by the same description as that now
contained in the lease to complainant, "said lot having a front-
age of thirty-one and one-half feet on Ocean avenue and at least
one hundred and four feet on New street," with the privilege
of purchasing the leased premises for $3,000 during or at the end
of the term, and Reese agreed on the execution of the lease to
place on the front part of the lot a two-story frame building.
The present permanent building line on Ocean avenue was estab-
lished after the fire, and Reese moved a frame building on the
lot, locating it about twenty feet from the front of the lot,
and used it as a saloon. About two years after the execution
of the lease, Reese moved to the lot a barn owned by him, locating
it at the rear of the lot and within a few inches of the westerly
line of the lot. The barn was a two-story frame building, about

thirty feet square, and, as located by Reese, did not extend farther back from New street than about thirty feet, but it cut off access to the portion of the "L" in the rear. Reese occupied the house and barn until his death—before the expiration of the lease—without exercising the option to purchase. His widow continued the same occupation as tenant without any additional lease until November, 1897, one year after the expiration of Reese's lease, and having married one Sigler (or Zigler), the defendant, on November 6th, 1897, gave Sigler a lease for five years at $350 per year. The description of the leased premises in Sigler's lease was identical with that in the Reese lease, and the same option to purchase for $3,000 was also included in this lease. Sigler occupied the house and barn, and also during his occupation built a one-story extension or lean-to on the north side of the barn of the same width as the barn, and which extended to the north line of the "L," thus covering the whole rear of the lot. This extension was connected with the barn, and stalls for horses were erected in it, the lower story of the barn being used for carriages. Sigler also built a shed on the east side of the barn, and until his death (in 1899), before the end of his term, exclusively occupied the house, barn and sheds and the defendant's entire lot. He moved the house or saloon on the front of the lot out to the building line and put an addition on the rear of this building, and the house or hotel has ever since remained in this location. The defendant says that, in making the original lease to Reese, he intended to reserve a lot for a barn with an entrance thereto, and to lease only the corner; that Reese so understood it, and that the barn subsequently put on the rear of the lot by Reese was moved there by defendant's permission, as he (defendant) had purchased a lot elsewhere for his barn and had then no occasion to use the lot. He also says that, at the time of his purchase of the buildings from Sigler's administrator, and of his sale of them to complainant, and even until the present dispute, he did not know of the erection of the lean-to or extension to the barn which was erected by Sigler. The description of the premises leased in the Sigler and Naughton lease with the option clause was taken by defendant from the Reese lease, and the leases are similar, except that the amount of purchase-money

in the Sigler lease is $3,000 and in the Naughton lease $4,000, and defendant now says that he had it in his mind, and intended in executing the Naughton lease, that the premises leased and sold were the same as in the original Reese lease. He swears also that the lease now in question was drawn by him and sent to Naughton, and then was brought back by Naughton, who objected that it did not cover the entire lot, and that on such objection he (the defendant) told him he (the defendant) knew it did not, but he (the complainant) would have to lease it that way or not at all, and that after demurring a little the complainant executed the lease as drawn. The complainant denies that this conversation took place, and for the purpose of deciding the first question the actual location of the premises according to the description in the lease itself, it is, I think, inadmissible and must be disregarded as tending to vary the deed. Its effect as establishing a mistake on defendant's part, or complainant's knowledge of it, will be considered hereafter. Even if it is admissible as evidence, bearing on the actual location of the lot leased as described in the lease, it is altogether vague and indefinite on this subject. For the purpose of locating the lot from the description in the lease, nothing appears in the case which would justify me in declaring that the description should not be taken as referring to the conditions existing at the time of the lease. If the description is, in fact, applicable to the conditions as they then existed on the ground, it must, *prima facie,* at least, be applied according to these conditions which are presumed to be in the minds of the parties and with reference to which they use the language of the contract. The lease did not refer to defendant's deed, either for fixing the beginning corner or any other purpose, and this deed, therefore, cannot, as against complainant, be referred to for the purpose of adding to or qualifying the words of the description in the lease as to the beginning corner. Fixed monuments existing on the ground must be taken as intended, rather than a beginning corner fixed by the original deed, which had been obliterated or abandoned for years before the agreement between the parties. If I am right in this view that the beginning corner of the lot leased and intended to be sold, located according to the description, was on the building

line marked by the house as it stood, then the lot leased was, according to the description in the lease, a lot with a frontage of thirty-one feet six inches on Ocean avenue and at least one hundred and four feet on New street from this line. This description, giving the two sides of the lot without further aid, might possibly leave the other boundaries uncertain if the lease alone be considered, although I am inclined to think that, in view of the actual location, occupation and use of the buildings on the lot at the time of the lease, the description of the lot as fronting thirty-one feet six inches on Ocean avenue and fronting one hundred and four feet on New street would cover the entire lot, including the "L" or all of it, at least to the one-hundred-and-four-foot line from the building line. But if there is any uncertainty or doubt about this description, the complainant in this case is so situated that, in equity, he has the right to remove the uncertainty or doubt by a reference to the original agreement of lease and sale. This was the agreement under which he entered into possession, and in this agreement the lot in question was referred to by defendant as "my lot on the corner of Ocean avenue and New street." The buildings were described as standing on this lot, and after agreeing to lease the lot till November 11th, 1902, defendant agrees that he "also will give said William Naughton privilege of purchasing said lot at the expiration of the lease as above." Naughton entered under this agreement, bought the buildings and occupied the entire lot with the buildings up to the lease of May 11th, 1899. It was no part of the agreement itself that the option to purchase should be a future option to be included in the lease, or that the option, if given in the lease, should terminate the option given in the agreement. It has not been satisfactorily shown that Naughton ever abandoned the original option, or that, in taking the option in the lease, he intended to do so. The fact that subsequent to the execution of the lease the occupation of the whole lot as leased property continued as under the agreement, without change or objection, and for the whole term of the lease, is very cogent evidence that it was not intended by the lease to change the terms of the agreement as to the property to be leased. And the effect of this mutual action of the parties in locating the lot

leased should not be overcome by defendant's statement that on the execution of the lease it was understood by complainant that it did not cover the entire lot. If this statement be true, which complainant denies, it appears that there was no explanation on either side as to what portion of the lot was not to be leased, or that the lease was intended in any way to modify the rights of the parties under the previous agreement as to the property leased. The evidence, if true, is too vague and indefinite to be made the basis for correcting or ignoring the language of the original agreement and the subsequent action of the parties as to the premises intended to be leased. The bill in this case is based on the original agreement as well as the lease, and so far as relates to the property actually leased and intended to be sold, my view is that, on the agreement and lease, signed by defendant, the complainant is entitled to a conveyance by defendant of his entire lot. I think the description of the premises should be

"my lot in Seabright * * * on the northwest corner of Ocean avenue and New street, on which the buildings formerly occupied by Arthur M. Sigler and wife stood on February 11th, 1899, and having a frontage of 31 feet 6 inches on Ocean avenue and at least 104 feet on New street."

I will hear counsel, however, on the language of the description. At the hearing I suggested that if there was any dispute as to the boundaries of the tract to be conveyed, as described in the option contained in the lease, the proper course might be to direct a conveyance, describing the premises in the words of the option under the lease, following the rule laid down by Vice-Chancellor Green in *Waters* v. *Bew, 52 N. J. Eq.* (*7 Dick.*) *787, 790* (*1894*), and adopted by me in *Gough* v. *Williamson, 62 N. J. Eq.* (*17 Dick.*) *526* (*1901*). But this course would disregard any equitable rights of complainant under the agreement or by reason of his possession of the premises, as fixing the boundaries of the lot sold, and it would or might also leave undecided the equities defendant now sets up against specific performance if his construction of the option be not sustained. Where a contract, uncertain in its terms, has been acted on and partly performed, the court, in order to relieve the objection of uncertainty, will, for the construction of the in-

strument, have regard in some cases to the user and course of dealing of the parties, to the surrounding circumstances and to their conduct between the making of the agreement and the commencement of the suit. *Fry Spec. Perf.* (*4th ed.*) §§ *381, 635,* and cases cited. On further consideration, therefore, I conclude that this is a case where both parties are entitled to have the question of the construction of the option in the lease and agreement as to the boundaries of the lot settled in this court, and that the case does not come within the principle of *Gough* v. *Williamson,* requiring a conveyance to be directed in the language of the description in the agreement. On the assumption that, under the agreement and lease, the lot leased and agreed to be conveyed should be construed to include the entire lot, the defendant, at the hearing, insisted that, if so construed, the agreement was entered into under a mistake on his part, and that the specific performance of the contract as thus construed would be so harsh and inequitable that it should not be directed. The mistake in the description of the lot, if any occurred, was due solely to the defendant and to his carelessness or negligence in not stating in the agreement and lease that the barn on the rear of the lot stood on land not leased or sold. The mistake was not in any way induced by the complainant, who appears to have examined the buildings before his purchase, and while the court does in some cases undoubtedly exercise its discretion to refuse specific performance where the mistake is that of the defendant alone, yet these are for the most part cases where the mistake is clear, and where a hardship, amounting to injustice, would be inflicted on defendant by holding him to his bargain, and it would be unreasonable to do so. *Tamplin* v. *James, 15 Ch. Div. 215, 221* (*Court of Appeals, 1880*). And where the defendant sets up a mistake or misunderstanding on his part as to the real meaning and effect of his written contract, it has been said, on general principles, that, to allow such a defence, would open the door to fraud and perjury and destroy the security of contracts. *Fry Spec. Perf.* (*4th ed.*) § *763.* A defendant should not be easily allowed to relieve himself from his written agreements by his simple statement or oath that he was mistaken in reference to the effect of the agreement, and the

mistake as well as hardship must certainly be clearly made out. In this case the defendant's whole course of conduct in reference to the occupation of the leased lot by Sigler and Naughton is opposed to any idea of mistake on his part, as to leasing the entire lot to them. As to Reese's occupation, the defendant's statement is confirmed by the description in the lease, but Reese is now dead, and defendant's statement at the hearing that he allowed Reese to occupy the rear of the lot with the barn because he had no longer any occasion to reserve the strip and the "L" for himself, and the fact that with the subsequent tenants he recognized the lot as leased, so far as occupied by buildings, would seem to justify an inference that after Reese's lease, at any rate, he did not intend to reserve any of the lot from the tenants. If this be correct, then the defendant, so far from being corroborated as to a mistake as to the lot intended to be leased to complainant, is contradicted by his own acts. The lot leased is by all of the papers treated and described as the lot to be sold, and the defendant cannot now, after the expiration of the lease, be heard to say that, although he intended to lease, he did not intend to sell the whole lot. On the whole evidence I do not think that defendant has shown any clear case of mistake. Neither does it clearly appear that inequity or hardship in enforcing this agreement on the construction now adopted by the court will result. The price of the lot, as fixed to complainant, was $1,000 higher than Reese's or Zigler's option price, and even admitting defendant's construction of the lease, and that the eight-foot strip with a lot twenty-five by thirty-eight feet in the rear was worth proportionately the same as the lot on the corner, the hardship to defendant is only a question of a comparatively small additional amount of money for the purchase price. Looking only at defendant's situation, this is not, in my judgment, such a manifest hardship or injustice, resulting from the enforcement of the contract, as to justify a refusal to give complainant the benefit of the contract. But, in reference to this whole question of mistake and hardship, which is now relied on as a defence against carrying out defendant's contract as construed by the court, it must be borne in mind that this construction of the court is the one which was undoubtedly given to the original

agreement by the complainant on making the purchase of the buildings and taking possession under the agreement, that it was apparently the construction of both parties so long as the lease lasted, and that complainant's action under the agreement and lease as so construed has thus been induced by the' defendant himself. These circumstances have given to the complainant on his side a substantial equity that prevents the application of the doctrine of mistake and hardship now invoked for the purpose of relieving defendant from his contract, for the complainant cannot be restored to his original situation. There is no provision in either the agreement or lease as to the disposal of the buildings in case of a failure to exercise the option, and apparently complainant's only protection for the purchase-money of the buildings was in the exercise of the option. It is true that defendant in his answer says that, at the time of the agreement, he agreed to repurchase these buildings if the option was not exercised, but this was not inserted in the agreement and it is not a term or condition which can now be added to the written agreement of the parties for the purpose of settling their rights under the option. The defendant claims that the barn and all the buildings are of very small value, but if the buildings which belonged to complainant stand on land which defendant agreed to sell to complainant, and which complainant intended to buy when he bought the buildings, then complainant has an equity to have them remain on the land he purchased, whatever their value. The bill of sale of the buildings, executed at the time of the lease, describes them "as erected and being on leased ground;" they were so sold to complainant and taken possession of by him to use in their location, and in equity he is entitled to retain them as erected on this ground. This equity is superior to the defendant's equity to be relieved from the result of his own mistake. On this point it should be further said that it appears by the evidence that on the lot as proposed to be conveyed by defendant there will not be room for the convenient location of the stables in connection with the barn, and it is also evident that the right to have the barn and stable continued in their present location contributes to the value of the property to complainant for either the occupation or lease of the lot.

I conclude, therefore, that the defendant cannot be relieved from the performance of his contract. If not so relieved in equity he must perform the agreement for sale, either in the very words of the contract contained in the lease, leaving the location of the lot as so described to be determined hereafter at law, or by the description in the lease, taken in connection with the original agreement of sale and the conduct of the parties in locating the lot. For the reasons above stated I think complainant is equitably entitled to have the boundaries and description of the lot settled in this suit, and to a decree for a conveyance of the lot substantially with the description above given. The accounts for rents and interest on the purchase-money must also be adjusted, and directions as to the removal of the encumbrances on the property, on payment of the purchase-money, if these encumbrances still exist.